OPINION OF THE COURT
Herbert Kramer, J.
Can plaintiff parishioner maintain a cause of action against *898 her priest for damages she allegedly sustained when their pastoral relationship developed into a sexual relationship? Although this is a question of first impression in New York,[1] it has been vigorously litigated across the country. Some of the courts considering this question were willing to sustain a cause of action for breach of fiduciary duty,[2] while others declined on First Amendment grounds.[3] Defendants seek summary judgment contending that it is impossible to try this case without trespassing onto constitutionally forbidden territory. Thus, it is this court’s task to determine whether the issues can be framed for the jury in secular rather than sectarian terms.
Plaintiff’s complaint sets forth 12 causes of action, but if her cause is to survive, it will do so only on the strength of her claim of breach of fiduciary duty.[4] Plaintiff’s narrative begins with her being diagnosed with multiple sclerosis in January of 1989. In February of 1989, “with nowhere and no one to turn to [she] looked to God for direction * * * [and] as a Catholic, [her] only thought was to seek the assistance of a priest.” Monsignor Sivillo began to visit plaintiff three and four times a week and encouraged her dependance upon him by emphasizing the mystical and esoteric nature of his power to cure her.[5] *899 Plaintiff asserts that she lacked the power to resist the defendant’s physical advances because she “was addicted to him and the [religious] power he possessed to halt the spread of the multiple sclerosis * * * [she believed that if she angered him, she] would lose her lifeline to God and continued health.”[6]
Civil controversies involving religious parties or institutions may be adjudicated without offending the First Amendment[7] as long as neutral laws of general applicability are utilized in their resolution. (Presbyterian Church v Hull Church, 393 US 440, 449 [1969].) Neutral principles are “wholly secular legal rules whose application to religious parties or disputes does not entail theological or doctrinal evaluations.” (Elmora Hebrew Ctr. v Fishman, 125 NJ 404, 414-415, 593 A2d 725, 730 [1991].)
The secular rule to be applied in this case is the law of fiduciaries. This area of the law recognizes that there is an imbalance inherent in certain relationships[8] which places one party at a disadvantage in its dealings with the other party. Courts have therefore imposed additional obligations upon the *900 advantaged party to compensate for the disparity.[9] Because the parameters of á fiduciary relationship have been vaguely defined[10] and the range of relationships that can potentially be characterized as fiduciary is extensive, we are grateful for the guidance offered by one commentator who has distilled four elements that we believe are essential to the establishment of a fiduciary relationship: (1) The vulnerability of one party to the other which (2) results in the empowerment of the stronger party by the weaker which (3) empowerment has been solicited or accepted by the stronger party and (4) prevents the weaker party from effectively protecting itself.[11]
Finally, we must recognize that in making a “neutral principles” analysis, it is not sufficient to be able to identify relevant secular rules. It is also necessary to insure that there exist neutral facts to which to apply those rules. Neutral facts consist of “evidence from which the court may discern the objective intention of the parties” such as “the language of ** * * deeds, the terms of [a] local church charter * * * State statutes governing the holding of church property [and the like]” (First Presbyt. Church v United Presbyt. Church, 62 NY2d 110, 121, 122 [1984]), without resorting to matters of doctrine or dogma.[12]
*901 Here, in order for plaintiffs cause of action to meet constitutional muster, the jury would have to be able to determine that a fiduciary relationship existed and premise this finding on neutral facts.[13] The insurmountable difficulty facing plaintiff, this court holds, lies in the fact that it is impossible to show the existence of a fiduciary relationship without resort to religious facts. In order to consider the validity of plaintiffs claims of dependency and vulnerability, the jury would have to weigh and evaluate, inter alia, the legitimacy of plaintiffs beliefs, the tenets of the faith insofar as they reflect upon a priest’s ability to act as God’s emissary and the nature of the healing powers of the church. To instruct a jury on such matters is to venture into forbidden ecclesiastical terrain. On the other hand, if we try to salvage plaintiffs claim by stripping her narrative of all religious nuance, what is left[14] makes out a cause of action in seduction — a tort no longer recognized in New York — but not in breach of a fiduciary duty.[15]
*902 Accordingly, the defendants’ motion is granted. The plaintiffs complaint is dismissed.

. In New York the litigation has involved the alleged sexual abuse of minors. (See, e.g., Jones v Trane, 153 Misc 2d 822 [Sup Ct, Onondaga County 1992].)

. See, e.g., F.G. v MacDonell, 150 NJ 550, 696 A2d 697 (1997); Sanders v Casa View Baptist Church, 898 F Supp 1169 (ND Tex 1995); Moses v Diocese of Colo., 863 P2d 310, 314 (Colo 1993); DeStefano v Grabrian, 763 P2d 275 (Colo 1988).

. Amato v Greenquist, 287 Ill App 3d 921, 679 NE2d 446 (1997); Dausch v Rykse, 52 F3d 1425 (7th Cir 1994); Schmidt v Bishop, 779 F Supp 321 (SD NY 1991); H.R.B. v J.L.G., 913 SW2d 92 (ED Mo 1995).

. Plaintiff has asserted claims sounding in negligence, professional negligence, negligent hiring, supervision and retention, breach of fiduciary duty, negligent infliction of emotional distress, intentional infliction of emotional distress and battery. With the exception of the claim of clergy malpractice, a cause of action not recognized in New York (see, Schmidt v Bishop, 779 F Supp 321, 324 [SD NY 1991], supra; Joshua S. v Casey, 206 AD2d 839 [4th Dept 1994]), the remaining causes of action either depend for their vitality on the claim of breach of fiduciary duty, or with respect to the alleged intentional torts, are time barred and lack factual support.

. Beginning in February of 1989, the defendant would visit her three and four times a week and “while sitting next to [her] on the couch would hold [her] cramped and contorted fingers and tell [her] how he spoke to God and how as God’s emissary he would see to it that the disease would go into remission.” Indeed, at one point during 1989, her physician informed her that the disease was indeed in remission and she “thanked God a million times for sending [her] this gentle savior.”

. Indeed, the spiritual and supernatural aspects of the relationship dominated plaintiffs narrative. Thus, defendant allegedly told plaintiff that he believed that “water was imbued with a mystical power to cleanse and heal * * * [and that] by standing under the water’s spray, the two of [them] would be paying homage to the glory and goodness of God who, in return, would absolve [them] of sin.” Plaintiff, allegedly at the defendant’s behest, kept a towel in her night table which the defendant would use to wipe his semen from her body. “The towel symbolized his everlasting presence. The semen represented an impenetrable line of defense that would ward off fear, loneliness and disease. As long as [she] had the towel, [she] had the means to remain healthy and loved. Any onslaught by negative or destructive forces would be doomed to fail in the presence of the towel a/k/a the defendant.”

. The First Amendment prohibits any ‘law respecting the establishment of religion, or prohibiting the free exercise thereof.” (US Const 1st Amend.) It “embraces two concepts, — freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society.” (Cantwell v Connecticut, 310 US 296, 303-304 [1940].) Certainly, intentional, criminally offensive conduct is not insulated from prosecution. (See, e.g., Joshua S. v Casey, 206 AD2d 839 [4th Dept 1994]; Kenneth R. v Roman Catholic Diocese, 229 AD2d 159 [2d Dept 1997].)

. “Historically, fiduciary relationships include: trustee, to beneficiary; guardian to ward; agent to principal; attorney to client; executor to legatees or beneficiaries; partner to partner; corporate directors or officers to the corporation; majority shareholders to other shareholders; and bailor to bailee.” (Villiers, Clergy Malpractice Revisited: Liability for Sexual Misconduct in the Counseling Relationship, 74 Denv U L Rev 1, 40 [1996].)

. The fiduciary bears the burden of showing the fairness of the disputed transaction. The fiduciary is obligated to make full disclosure. The fiduciary may not be able to raise the defense of Statute of Frauds, or consent. The entrusting party may not bear the entire burden of discovery of the fraud. Moreover, the transaction must, regardless of consent, be deemed reasonable and be undertaken in good faith when judged by objective standards. (Villiers, op. cit, at 39, n 255.)

. In Penato v George (52 AD2d 939, 942 [2d Dept 1976]) the Court opined that “a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another * * * the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another * * * Such a relationship might be found to exist, in appropriate circumstances, between close friends * * * or even where confidence is based upon prior business dealings”.

. These elements were derived through a careful review of the existing case law and an astute application of the philosophical and pragmatic aspects of this area of the law. (Scallen, Promises Broken vs. Promises Betrayed: Metaphor, Analogy, and the New Fiduciary Principle, 1993 U Ill L Rev 897, 922 [1993].)

. (See, Avitzur v Avitzur, 58 NY2d 108 [1983].) In Avitzur, a four-to-three decision, the majority upheld the terms of a Ketubah, a Jewish religious marriage contract, finding neutral facts that evidenced the agreement between the parties, to wit, “[DJefendant promised that he would, at plaintiff’s request, appear before the [rabbinical tribunal] for the purpose of allowing *901 that tribunal to advise and counsel the parties concerning their marriage” which promise constituted nothing more than a “civil contract to submit a dispute to a nonjudicial forum”. (Supra, at 113, 114.) However, the caution of the dissent, which did not find the contract susceptible to so neutral an interpretation was well taken. (See also, Park Slope Jewish Ctr. v Congregation B’Nai Jacob, 90 NY2d 517 [1997]; Park Slope Jewish Ctr. v Stern, 128 Misc 2d 909 [Sup Ct, Kings County 1985], mod 128 AD2d 847 [2d Dept 1987].)

. “The existence of a fiduciary relationship is a question of fact for the jury.” (Moses v Diocese of Colo., 863 P2d 310, 322 [Colo 1993], supra; see also, Matter of Antoinette, 238 AD2d 762 [3d Dept 1997].)

. Plaintiffs account of the relationship when considered without reference to her religious beliefs describes the development of an intimate personal relationship based upon the fact that she was seriously ill, lonely and isolated and needed a sympathetic ear. She found a willing and sympathetic friend and companion in defendant who, according to her narrative, was able to use this situation to his advantage and transform the relationship into a sexual one.
This neutered account does not supply the facts necessary to support the existence of a fiduciary relationship because the most important element defining the fiduciary relationship, and distinguishing it from a merely confidential relationship — the inability of the weaker partner to resist the manipulation of the stronger partner — is missing from the neutered account. This element is present only in the religious account of their relationship in statements such as those pertaining to her belief that she would lose her lifeline to continued health if she resisted defendant’s advances. (Villiers, op. cit., at 41, nn 263, 264.)

. “In 1935, New York adopted what has become known as a heart balm statute [Civil Rights Law §§ 80-a — 84] which abolished all causes of action * * * ‘based upon alleged alienation of affections, criminal conversation, seduction and breach of contract to marry’ ” (Gaden v Gaden, 29 NY2d 80, 84 [1971]). The tort of seduction along with other causes of action for alienation *902 of affection invited “ ‘grave abuses * * * and in many cases * * * resulted in the perpetration of frauds’ ”. (Supra, at 85 [1971].) The same abuses could attach to a cause of action for breach of fiduciary duty, under our facts, unless care is taken to insure that the duty is imposed only upon clear and unequivocal proof of the existence of a fiduciary relationship.